Joseph P. Sullivan, J.
Defendant, charged with robbery in the first degree and related offenses, moves for a dismissal of the indictment and for other forms of relief on the ground of discriminatory prosecution in that he is being prosecuted as a major offender by the Bronx District Attorney. The major offense program, which has been operating in Bronx County since July 2, 1973, with the financial assistance of the Law Enforcement Assistance Administration, is basically a program of accelerated prosecution.[1] It is directed towards the perpetrator of the serious crime and the repeat offender. Its goal is to insure swift and certain justice for such malefactor.
As part of the program, the Bronx District Attorney’s office instituted a system of screening procedures which identifies those cases in which the crime is particularly heinous or the alleged offender is a serious recidivist. Those cases are then evaluated by the major offense bureau for selective prosecution. The prosecution of major offense cases is marked by limited plea bargaining, full disclosure to defense counsel, immediate and thorough case preparation, and the assignment of a single Assistant District Attorney to handle a given case through all stages, from inception to conclusion.
In an evaluation of the bureau’s performance in the first three years of its existence, it was found that the median time *409 between arrest and case disposition was 97 days compared to a median time of 400 days for all other felony cases prosecuted by the Bronx District Attorney. A comparison between major offense cases and a select group of similar cases from the caseload of the Bronx District Attorney’s Supreme Court bureau shows an over-all conviction rate of 96% for the former and 84% for the latter; after trial, the conviction rate was 92% for the former and 52% for the latter. In cases prosecuted by the major offense bureau, 94% of those convicted were incarcerated as opposed to 79% in the comparison group cases. A survey of dispositions in a typical year since the program’s inauguration shows that the average maximum sentence for a defendant prosecuted by the major offense bureau is 10 years. In the comparison group the average maximum is 3.5 years.[2]
Defendant’s moving papers consist of a rambling, prolix series of allegations, couched mainly in the form of rhetorical questions, attacking the legality of the major offender program. To appreciate fully the thrust and dimension of the broadside launched by these motion papers, a list of the various forms of ancillary relief sought is set forth:
(1) A hearing on all aspects of the operations of the major offense bureau, including the method of selecting the parts of the court in which its cases are tried, and the effect of Federal funding of State programs on an independent judiciary and on the rights of a defendant. Defendant argues that such hearing is required to provide him the opportunity to gather facts in order that he may move this court, the appellate courts and the Federal courts for dissolution of the major offense bureau of the office of the District Attorney.
(2) Discovery.
(a) The private and public records of the major offense bureau of the office of the District Attorney.
(b) The criteria used by the District Attorney for the assignment of cases to the major offense bureau.
(c) The criteria employed by the Supreme Court of the State of New York for the assignment of cases to parts designated for the trial of major offense bureau cases, and the identity of the party responsible for the court-created criteria.
(d) A statistical breakdown of sentences given in major *410 offense bureau parts in comparison to sentences given in nonmajor offense case parts.
(e) Records reflecting the reasons why defendants prosecuted in major offense bureau parts receive speedier trials than those prosecuted in other parts of the court.
Charging violations of the equal protection and due process clauses of the United States Constitution (5th and 14th Arndts), defendant cites the following reasons, inter alia, as the bases for granting the relief sought:
(1) Defendants prosecuted by the major offense bureau receive discriminatory, cruel and unusual punishment because
(a) they are not permitted to plea to lesser charges and
(b) they receive more severe sentences and more unfavorable publicity.
(2) The practice of setting aside special parts of the Supreme Court solely to hear cases prosecuted by the major offense bureau is discriminatory, illegal and unconstitutional.
(3) The speed with which major offense bureau cases are presented to the Grand Jury serves to deny defendants so prosecuted of a preliminary hearing (CPL 180.60).
Without avowing any particular constitutional deprivation, defendant seems to be implying that he is being denied some fundamental right by being selected for prosecution as a major offender. Such vagueness is due, no doubt, to the difficulty he has in recognizing just what right it is that he is being denied. He certainly cannot claim that he is being denied the right to a speedy trial. If anything, the program augments that right.
Generally speaking, the gravamen of defendant’s complaint seems to be that by being cast as a defendant in the accelerated prosecution program, he is being deprived of the right to be treated the same as other defendants in the criminal process. This argument is without merit.
At the root of this challenge is the oft-heard criticism that defendants prosecuted under the major offense program are being denied the plea bargain opportunities that are available to those not so prosecuted. There is, of course, no constitutional right to a plea bargain (People v Bullock, 80 Misc 2d 73, 78). In stating this principle, there is no intention here to disparage plea bargaining or gainsay its efficacy in the crimi *411 nal justice system. (See Santobello v New York, 404 US 257, 260.)[3]
Plea bargaining does in fact occur in the overwhelming percentage of major offense prosecutions but not on terms in which the elements of delay and staleness of prosecution are a factor. In most instances, the plea offered is to the highest count of the indictment or to the next highest count. Doubtless, it is this feature of the program that is so distressing to a defendant. If there is a certain intransigence in the position of the prosecutor as regards his plea offer in a major offense case, it is due to the fact that his case is relatively strong, well prepared and free of the debilitating effect of delay.
It should be noted at the outset that the major offense program involves a decision by the District Attorney of Bronx County to prosecute certain individuals by means of a procedure different from what is used to prosecute the majority of those accused of the commission of felonies. It is not a decision to prosecute only certain types of crimes or individuals. If a particular defendant is not selected for prosecution under the major offense program, he is prosecuted nonetheless. In short, what is involved is selective prosecution, not selective enforcement.
The District Attorney of Bronx County is charged by statute to prosecute diligently and fairly every crime committed by an adult within his jurisdiction (County Law, § 700 et seq.). He is an agent of the People, independent of the judiciary. Of necessity, he must be free to allocate his resources, in terms of manpower and finances, to discharge the duties of his office to the best of his ability. That includes the right to focus greater attention upon the prosecution of those charged with serious crimes and the career criminal.
In 1973, faced with a caseload of such dimension that a two-year delay between indictment and trial was not unusual, the District Attorney of Bronx County decided to isolate those cases in which special prosecutorial attention was warranted. The major offender program was a response to studies which concluded that a relatively small number of offenders were responsible for a disproportionate number of serious crimes.[4] *412 It was not an unreasonable exercise of optimism to hope that such a program might even restore some measure of the public’s confidence in the criminal justice system.
In People v Johnson (38 NY2d 271, 278), the Court of Appeals took the occasion to criticize any prosecutorial priority system for the trial of criminal cases which is based purely on chronological order. "Such an unrefined priority system, taking into account only the date of the indictment and the incarceration of the accused, falls short of demonstrating that the delay in reaching this particular case for trial was due to a shortage, rather than mismanagement, of personnel.”
It has been held that prosecutorial discretion in law enforcement "is by its very nature exceedingly broad” (Washington v United States, 401 F2d 915, 925; see, also, United States v Gainey, 440 F2d 290, 291-292; Newman v United States, 382 F2d 479, 480). "The conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation” (Oyler v Boles, 368 US 448, 456).
In Oyler, the Supreme Court was faced with the question whether a failure to prosecute other eligible offenders under an habitual criminal statute because of either a lack of knowledge of prior offenses or the exercise of reasonable selectivity in enforcement denied equal protection to those prosecuted. In rejecting the claim, the court stated (p 456): "Even though the statistics in this case might imply a policy of selective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification”.
Under the program attacked here the standard for selective prosecution is clear and simple:
(1) the crime must be of a serious or violent nature, or,
(2) involve a repeat offender.
It has been held that "Two persons may have committed what is precisely the same legal offense but the prosecutor is not compelled by the law, duty or tradition to treat them the same as to charges. On the contrary, he is expected to exercise discretion and common sense to the end that if, for example, one is a young first offender and the other older, with a criminal record, or one played a lesser and the other a dominant role, one the instigator and the other a follower, the prosecutor can and should take such factors into account” (Newman v United States, 382 F2d 479, 481-482, supra).
*413 To render a procedure in a criminal trial constitutionally infirm what must be shown is "a difference either based on a constitutionally suspect standard or lacking in rational justification” (Washington v United States; 401 F2d 915, 923, supra; see, also, Loving v Virginia, 388 US 1, 9; McLaughlin v Florida, 379 US 184, 191; Skinner v Oklahoma, 316 US 535, 541-542).
"Equal protection does not require identity of treatment. It only requires that classification rest on real and not feigned differences, that the distinction have some relevance to the purpose for which the classification is made, and that the different treatments be not so disparate, relative to the difference in classification, as to be wholly arbitrary” (Walters v City of St. Louis, 347 US 231, 237; see, also, Washington v United States, 401 F2d 915, 923, supra). Clearly then, "Dissimilar treatment reasonably accorded persons dissimilarly situated does not implicate the equality demand of the Fifth Amendment” (United States v Bell, 506 F2d 207, 222).
In Griffin v Illinois (351 US 12, 17), the Supreme Court stated that "our own Constitutional guarantees of due process and equal protection both call for procedures in criminal trials which allow no invidious discrimination between persons and different groups of persons.” So, it is not all procedural distinctions and classifications in criminal trials which are constitutionally proscribed, only the invidious.
The principle has also been stated thus: "That different persons receive different treatment at the hand of Government does not, without more, demonstrate constitutional inequality” (United States v Bell, 506 F2d 207, 221, supra; see, also, Griffin v School Bd., 377 US 218, 230; McGowan v Maryland, 366 US 420, 425; Washington v United States, 401 F2d 915, 923, supra).
The constitutional test, therefore, is whether a particular policy of selective prosecution has discriminated against a class or an individual on the basis of race, religion, or some other arbitrary classification. No such claim is made here. Nor could it be.
To this court’s knowledge, there is no reported appellate decision precisely on point on the issue whether a program of accelerated prosecution, involving as it does the concept of selective prosecution, constitutes an invidious classification. However, we are not without judicial guidelines.
By analogy, the Supreme Court has given us persuasive *414 dictum on the issue whether a program of selective prosecution, such as is involved here, would offend the constitutional guarantee of equal protection. In Johnson v Louisiana (406 US 356, 364), a defendant convicted of robbery asserted a challenge to a State statute which provided that unanimous verdicts were necessary in capital cases but allowed less than unanimous verdicts in other classes of cases. The court held that it was the purpose of the statute "to 'facilitate, expedite and reduce expense in the administration of criminal justice’ [citations omitted]. We discern nothing invidious in this classification * * * The State may treat capital offenders differently without violating the constitutional rights of those charged with lesser crimes.”[5]
Another source of support, by analogy, for the constitutionality of the major offender program is to be found in the Supreme Court’s consistent recognition of the constitutionality of habitual criminal statutes. These statutes, which impose heavier penalties for defendants who have previously been convicted of certain crimes, have been uniformly upheld against challenges on equal protection grounds, as well as on other constitutional grounds (McDonald v Massachusetts, 180 US 311; Spencer v Texas, 385 US 554; Oyler v Boles, 368 US 448, supra).
In Kendrick v United States (238 F2d 34, 37), the court stated: "It is well established that a state legislature does not violate the equal protection provision of the Fourteenth Amendment in enacting statutes which impose a heavier penalty for second or subsequent offenses, since the fact of a prior conviction in such cases is considered as affording a reasonable basis for classification.” (See, also, Epperson v United States, 371 F2d 956.)
A further argument for the constitutionality of the classification is to be found in Marshall v United States (414 US 417, 422). Petitioner contended that title II of the Narcotics Addict Rehabilitation Act of 1966 (US Code, tit 18, §§ 4251-4255), denied due process and equal protection by excluding addicts with two or more prior felony convictions from a discretionary rehabilitative commitment. The court upheld the constitutional validity of the classification, stating: "the concept of equal protection * * * does not require that all persons be *415 dealt with identically, but rather that there be some 'rational basis’ for the statutory distinctions made, [citations omitted] or that they 'have some relevance to the purpose for which the classification is made’” (citations omitted).
A recent Court of Appeals decision (People v Drayton, 39 NY2d 580) lends additional support for the constitutionality of the major offender program. There, the court held that CPL 720.20 providing for the discretionary classification of an eligible youth as a youthful offender in the "superior” court as contrasted to the mandatory classification of an eligible youth as a youthful offender in a local criminal court does not violate equal protection. The court stated (p 585) that "The distinction between youths charged in superior as opposed to local criminal courts is not arbitrary; it is based on the nature of the crimes over which such courts have trial jurisdiction. * * * Viewing the distinction as one resting upon the gravity of the crime charged, we are of the opinion that there is a rational basis for distinguishing between a youth accused of a felony and one charged with a misdemeanor. The seriousness of the crime charged * * * in conjunction with the defendant’s prior record or behavior, is of significant bearing” on the classification of a youth as a youthful offender.
In fairness, it must be recognized that the line between selective enforcement and selective prosecution (or selective procedure, to be more precise) is often a thin one. In either case, a prosecutor is making a decision which will result in different treatment for defendants who are on the surface, at least, similarly situated. For that reason, some consideration here should be given to those decisions which have considered the issue of selective enforcement.
These cases all gravitate to the proposition that although a statute may be constitutional on its face, unequal administration of that statute may violate equal protection. (See, e.g., Yick Wo v Hopkins, 118 US 356; see, also, Ah Sin v Wittman, 198 US 500; United States v Berrigan, 482 F2d 171; People v Utica Daw’s Drug Co., 16 AD2d 12.)
In Snowden v Hughes (321 US 1, 8), which dealt with a claim of unlawful administration of a State law having to do with certification of party nominees after a primary election, it was held that "The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be *416 present in it an element of intentional or purposeful discrimination.”
The standard of intentional or purposeful discrimination has been applied to a claim of prosecution brought to chill the exercise of a First Amendment right. In United States v Falk (479 F2d 616, 620), the defendant had been convicted of a violation of a law requiring him to possess a selective service card. On appeal, an issue was raised as to whether he was entitled at trial to a hearing on his charge of discriminatory purpose on the prosecutor’s part in seeking the indictment. With two dissenting opinions, the majority held that he was. The court stated, however, that "The presumption is always that a prosecution for violation of a criminal law is undertaken in good faith and in a nondiscriminatory fashion for the purpose of fulfilling a duty to bring violators to justice.”
This presumption of prosecutorial regularity was followed in United States v Banks (368 F Supp 1245), which involved a prosecution arising out of incidents which took place during the siege at Wounded Knee. The court stated (p 1252): "In the instant case, the defendants are charged with serious and dangerous crimes. This fact enhances the presumption of prosecutorial regularity since it renders much less likely the possibility that the government was motivated by a desire to discriminate against specific individuals for their engagement in constitutionally protected activities, and much more likely that the government was properly motivated by a desire to protect society from dangerous and illegal activities”.
In United States v Bland (472 F2d 1329, cert den 412 US 909), which involved a prosecutorial decision to proceed against the defendant as an adult rather than as a child, a decision which meant the application of vastly different procedures, the court found no violation of equal protection. (See, also, Hutcherson v United States, 345 F2d 964, cert den 382 US 894.)
There has been no claim nor showing here that this or any major offense prosecution was motivated by a desire to chill or in any way curtail the exercise of a defendant’s constitutional right.
The crucial issue raised by this motion is whether the prosecution of this indictment as a major offense case deprives defendant of any constitutional right in the criminal process.
In Stump v Bennett (398 F2d 111, 114, cert den 393 US 1001), the court stated: "The fundamental bases of 'due proc *417 ess’ relate to adequate notice and reasonable opportunity to be heard [citations omitted]. Beyond these minimal standards only oppressive and arbitrary state procedural rules command federal review.”
There is no claim here that the prosecution of this or any case under the major offense program deprives a defendant of sufficient time for the preparation of an adequate defense. If the fact were otherwise then the program clearly would be unconstitutional.[6] But, absent the denial of some constitutionally protected right, a program of accelerated prosecution does not offend due process concepts. "Courts do not deny due process merely because they move expeditiously” (Eubanks v United States, 336 F2d 269, 270; see, also, Allen v MacDougall, 267 F Supp 837).
Defendant does complain, however, that he was denied a preliminary hearing (CPL 180.60), which raises the issue whether the major offense program offends due process on the ground that in practice it involves a by-passing of the felony complaint hearing.[7]
There is no paucity of State or Federal decisional law to support the proposition that a preliminary hearing is not constitutionally required where there has been a Grand Jury indictment.
The general rule in this State is that the Grand Jury has the power to investigate and indict regardless of what has occurred before the Magistrate and regardless of whether the Magistrate has held or discharged the prisoner or still has the matter pending, or of whether there has ever been such a preliminary hearing (People ex rel. Hirschberg v Close, 1 NY2d 258, 261). A defendant has no constitutional or statutory right to a preliminary hearing as a condition precedent to a valid indictment. (See Goldsby v United States, 160 US 70, 73; Hughes v Gault, 271 US 142, 149; People ex rel. Hirschberg v Close, 1 NY2d 258, supra; People v Abbatiello, 30 AD2d 11, 12.)
Federal case law equally supports this view. In United States v Caesar (368 F Supp 328, 333), the court stated: "it [the Grand Jury] remains a legitimate method of initiating *418 criminal proceedings. It is an alternative to the complaint and preliminary examination method of determining probable cause to hold a person for trial. Therefore, preliminary examinations, which are intended to accomplish the same end, are unnecessary following the presentation of a true bill.” (See, also, e.g., United States ex rel. Walker v Henderson, 492 F2d 1311, 1314, cert den 417 US 972; Harris v Estelle, 487 F2d 1293, 1296; United States v LePera, 443 F2d 810, 811, cert den 404 US 958.)
The designation of special parts to hear major offender cases comes in for its share of criticism in defendant’s moving papers. It is a fact that under the major offender program specific parts are set aside for the disposition of major offense cases and that the Judges presiding in such parts hear these cases exclusively.
In Bronx County, as the program is currently being implemented, there are two trial parts set aside solely for the disposition of major offender cases. There are available, of course, other parts to which the overflow of these cases may be sent for trial. The Judges presiding in parts designated for hearing major offense cases are aware that the defendants before them are labeled as major offenders by reason of either a record of recidivism or the serious nature of the crime charged. Parenthetically, it should be noted that the jurors do not know that the defendant is being prosecuted as a major offender. The trial part handling major offender cases is numbered as are all trial parts in Bronx County. No designation other than number identifies the courtroom. The indictment bears no special marking. The only question therefore which arises is whether the Judge’s knowledge of the defendant’s background prejudices the defendant’s right to a fair trial so as to be constitutionally impermissible.
The issue seems to have been decided by the Supreme Court in Spencer v Texas (385 US 554, supra). In the State court, the defendant was brought to trial pursuant to a recidivist statute. Through allegations in the indictment and the introduction of proof at trial, the jury was fully apprised of the defendant’s past convictions. The jury was charged, however, that those convictions were not to be considered in deciding the defendant’s guilt of the charges for which he was standing trial. The defendant challenged this procedure as a violation of due process. In upholding the validity of the procedure, the court discussed the concept that evidence of prior crimes was *419 traditionally admissible in criminal proceedings on divers grounds and for various purposes. The court found it persuasive that the procedure involved fostered a valid State purpose, i.e., the enforcement of habitual offender statutes. It therefore held that as long as limiting instructions were given to the jury, the constitutional rights of the defendant were sufficiently protected. The court made the following observations:
"Cases in this Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial [citations omitted]. But it has never been thought that such cases establish this Court as a rule-making organ for promulgation of state rules of criminal procedure * * * In the face of the legitimate state purpose and the long-standing and widespread use that attend the procedure under attack here, we find it impossible to say that because of the possibility of some collateral prejudice the Texas procedure is rendered unconstitutional under the Due Process Clause as it has been interpreted and applied in our past cases” (pp 563-564).
"Tolerance for a spectrum of state procedures dealing with a common problem of law enforcement is especially appropriate here. The rate of recidivism is acknowledged to be high, a wide variety of methods of dealing with the problem exists, and experimentation is in progress” (p 566).
"With recidivism the major problem that it is, substantial changes in trial procedure in countless local counts around the country would be required were this Court to sustain the contentions made by these petitioners. This we are unwilling to do. * * * It would be a wholly unjustifiable encroachment by this Court upon the constitutional power of States to promulgate their own rules of evidence to try their own state-created crimes in their own state courts, so long as their rules are not prohibited by any provision of the United States Constitution, which these rules are not” (pp 568-569).
In deciding a somewhat analogous case, McGautha v California (402 US 183, 209-210), the Supreme Court cited Spencer for the proposition that due process does not require a bifurcated trial wherein evidence relevant solely to the issue of punishment would be considered separately from the issue of a defendant’s guilt.
The vitality of the Spencer rationale was demonstrated again by a 1974 Federal decision (Evans v Cowan, 506 F2d *420 1248). In that case, the appellant was indicted for armed robbery and for being an habitual criminal. Prior to trial, he moved for a bifurcated trial with the habitual criminal charge tried separately from the charge of armed robbery. In addition, he moved that no evidence of the prior convictions be admitted during the trial on the principal offense. Both motions were denied. A single trial was held on the issue of the defendant’s guilt on a robbery charge and of his being an habitual criminal. No limiting instruction not to consider the defendant’s prior convictions in determining his guilt on the robbery charge was given to the jury. While the court held that the Trial Judge had a duty to give a limiting instruction, it noted (p 1249) that "the habitual criminal issue may be combined with the trial of the felony charge, even though it is a separate and distinct issue”.
It follows, of course, that if no constitutional infirmity attaches in instances where the trier of the fact, i.e., the jury, is aware of the defendant’s prior record then certainly none exists if the court is made aware.
In Irvin v Dowd (366 US 717), the Supreme Court established the guidelines applicable to jury qualifications, stating (pp 722-723): "It is not required * * * that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror’s impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court”.
Spencer, McGautha and Irvin support the conclusion that a defendant prosecuted as a major offender is not unduly prejudiced by the fact that the Judge is aware of his past criminal record.[8]
*421 One final word is in order on the matter of the designation of specific parts to hear major offense cases. "It is an ancient and undisputed law that courts have an inherent power over the control of their calendars, and the disposition of business before them including the order in which dispositions will be made of that business” (Plachte v Bancroft, Inc., 3 AD2d 437, 438; see, also, Rab v Colon, 37 AD2d 813; Kriger v Holland Furnace Co., 12 AD2d 44, 46-47; Landis v North Amer. Co., 299 US 248, 254; Kennard v Louisiana ex rel. Morgan, 92 US 480).
If the establishment of special parts facilitates the disposition of cases and contributes to the resolution of the chronic problem of trial delay then the courts are properly exercising that power.
In the final analysis, both the prosecutor and defense attorney, whatever their differences, should be in agreement on one basic theme, that is, that the "speedy disposition of criminal cases is desirable” (United States v Healy, 376 US 75, 80).
The motion is denied in its entirety.

. It is one of 20 programs which have been named an Exemplary Project by the National Institute of Law Enforcement and Criminal Justice. (McGillis, An Exemplary Project: the Major Offense Bureau, Bronx County District Attorney’s Office New York [1977], inside front cover.)

. (McGillis, pp 53, 55, 57; see n 1.)

. "The disposition of criminal charges by agreement between the prosecutor and the accused, sometimes loosely called 'plea bargaining,’ is an essential component of the administration of justice. Properly administered, it is to be encouraged. If every criminal charge were subjected to a full scale trial, the States and the Federal Government would need to multiply by many times the number of judges and court facilities” (supra, p 260).

. (McGillis, p 1; see n 1.)

. This court is aware that in the cited case as well as several others hereinafter discussed, the court’s review was of a legislative enactment rather than a prosecutorial determination.

. (See Martin v Commonwealth of Virginia, 365 F2d 549.)

. Major offense bureau statistics for Bronx County show that 99% of its indictments are returned by the Grand Jury within three days of arrest, thereby averting the felony hearing which is mandated within 72 hours of arraignment by CPL 180.80. (McGillis, p 53; see n 1.)

. Under current New York law, the trial court to whom application is made must rule in advance of trial as to what, if any, convictions or prior bad acts may be elicited on cross-examination should the defendant testify in his own behalf (People v Sandoval, 34 NY2d 371). At this juncture the court is made aware of the prior record. *421 This court is hard put to recall the case in which a defendant having a criminal record did not make the Sandoval application.